All right, come on up, Mr. Hilbert, whenever you're ready. Mr. Hilbert. All right, sir, you're on. Good morning, members of the panel. My name is Otto Hilbert, and I'm here on behalf of Arcturus Corporation, Asher Energy, LLC, Leon Ali Parvizian, Robert Balunas, and R. Thomas & Co. Essentially, your honors, we believe that there is a woefully inadequate record for summary judgment in this case. There are a myriad of material issues of fact. Of the 380 partners in various of the joint venture partnerships at issue, the SEC obtained statements from two. Diametrically opposed to those two are the 15 affidavits submitted by my clients, which I'll refer to for convenience sake, as the Parvizian clients, defendants, appellants. And we actually submitted 25, but the record in the lower court only accepted 15. Additionally, Mr. Parvizian's declaration is completely at odds with the two affidavits of the SEC. Related to the case are six different joint venture partnerships. There is a complete dearth, zero evidence, with respect to three of the six partnerships. And the two affidavits, one Mr. Ulrey participated in a Pawanka and a Hillock partnership, and Mr. Traver participated in a Pawanka and Connelly partnership. So there's no evidence in the record with respect to the Chips, the Fraley-Nelson, and the Weed partnerships. This is a case where the presumption that a partnership is a partnership, the strong presumption under Williamson and Nunez from the Fifth Circuit, is turned on its head. Here, with the goggles on that this is a security, everything like a domino effect falls from that mistaken conclusion. And there are no angry investors in your courtroom. There were no civil cases brought by them. This is a case brought by the SEC. The SEC almost certainly invited all 380 partners to complain, and they obtained two. And again, they're just on the sheer weight of affidavits and declarations in the case. Those two are far outweighed by the evidence presented by the provision defendants in the lower court. As you're well aware, the Williamson and Nunez case create a strong presumption that a partnership is exactly that. And we believe that when this case is ultimately tried, which we hope occurs, that we can demonstrate that these operated as partnerships operate. And we don't believe that the SEC bared any burden, much less the heavy burden of proof required under the Williamson and Nunez cases. I have tried cases with respect to this business model all over the country, and usually these cases are resolved on the second prong of the Williamson test, which is essentially whether these wealthy, sophisticated business owners can make or are capable of making an intelligent business decision. Taken to the illogical extreme of what the SEC proposes before you in this case, if two people wanted to open an ice cream store and knew nothing about how to make ice cream, it would be a security. What happened in this case is the provision defendants, those managing venture partners, obtained expert analysis from household names, international conglomerate companies, Schlumberger, Halliburton, Baker Hughes, well-respected companies, experts in their field. And Mr. Parvizian and his entities put together projects, well sites. They selected operators. Let me stop you a minute and ask you this. In this case, there were not cross motions for summary judgment. Is that right? Just the motion of the SEC or were there cross motions? There were cross motions. All right. And your motion, I understand your position about theirs, but you moved for summary judgment on the basis what? Surely it couldn't have been based on what? You moved for summary judgment based on what? A legal proposition that the investments were not security? Correct. Okay. Not on a factual basis. Your summary judgment was premised on entitlement to judgment as a matter of law because of the whole investment. Is that it? Correct. The partners in our mind had extraordinary powers. With a 60% vote of the partners, they could replace the managing partner. With a 50% vote, they could vote to complete a well, which is a huge undertaking, a huge decision. The question I'm heading to is you say out of the gate that this case was not crime for summary judgment for reasons you've iterated. I did look to see there are a bunch of these cases where these issues have been raised. It seemed to me most of them were not summary judgment cases, but were tried. You say you've tried a lot of them. I don't mean I don't know when I asked the SEC this, but my question was both of you filed for summary judgment, the SEC and you. The fact that you asked for summary judgment, does that militate against your argument that they couldn't have moved for summary judgment or said differently that the district court could not have even concluded as you wanted them to about investment or not without having a full weight of case? The fact that you asked for summary judgment, does that minimize the force of your argument here that we ought to send it back? Do you follow me? I do. I think that maximizes our argument. I think if there's summary judgment warranted in this case, it is clearly warranted in my client's favor. We had, as I mentioned, 26 affidavits all saying one thing. The confidential information memorandum in this case is like a phone book of information. I get it, but my guess of Matt, if that's true, then why would it be appropriate for the district court to view the credibility of all that? In the summary judgment context, the same thing you oppose happening the other way. It seems to me somehow that still would have been a matter of all investors, everybody else involved. Why would the process be, do you follow me, so much easier if you've got 300 and some investors, all these affidavits, but to say the district court could or should have viewed those and the like most favorable to you to move it and granted summary judgment in your favor. But on the other hand, the SEC says, well, it's a matter of law. It's the securities and same thing. It just seems to me somehow not . . . I'm not saying it's inconsistent, but that's why I asked the question. I kind of see how this is driving. The record was good enough for you to get summary judgment, but not good enough for them to get summary judgment. Well, I would say, Your Honor, that we filed that motion for summary judgment with more and better evidence than the SEC did. The SEC's case is totally reliant on two out of 380 participants. But I would be thrilled if Your Honor says, pox on both your houses, let's go try the case, because that's what should happen. Not even a deposition was taken in this case, and my client has been excoriated . . . I'm glad you said it because I was going to ask that, what the state of the summary judgment record is. I know you're out of time, but I was going to ask, how many depositions were taken in this case by anybody? None? Zero. This case is at its infancy, and we're ready to go try it. All right. Well, the SEC's about to jump out the chair, but they'll get their chance to answer because everybody asked the same thing. I mean, as one who's been there, sitting at the trial, I'm just wondering, was there a pretrial order? Was this thing set for trial? I know everybody thinks they're right on it, but it's, just from my eyes, a little oddly postured that it's got all this stuff you both say is there, yet no depositions? I mean, even in an employment case, the supervisor's deposition is taken. Anyway, I'm not saying that's the answer, and I'm not trying to speak for the panel. These are just things that Arsenio Hall used to say make me go, hmm. And to enter a judgment for $14 million in punitive sanctions and find fraud and see enter on this record, it makes us all go, hmm. All right. Well, I appreciated it. As I said, I didn't mean to take you away from the core elements, but you led with summary judgment was inappropriate. That was your leading line, and so I had some questions on that. I appreciate that, Your Honor. I do want to say one thing. If he is jumping out of his chair, I'm late to the game. I was not involved in the case in front of Judge Kincaid. To my understanding, nobody in this case has been under cross-examination. Nobody. Okay. All right. Thank you, Your Honor. Thank you, sir. You've rebuttaled a little bit of rebuttal time. All right. All right. We're going to hear from Mr. Cox. Go ahead. May it please the Court. Chief Judge Stewart, Judge Dennis, Judge Willett, Joe Cox here for Alfredo Gonzales and AMG. We're the promoter here in this case. Some of the defendants as well, they got swept up in this thing. In my brief time, I've got five minutes, so I'm going to try to be brief. I'm going to talk about three topics. One, I'm going to call the meaningful dissent. Two is going to be one of these things is not like the other. And the third one is going to be go boldly where no one else has gone. So the first one is the meaningful dissent. In the SEC versus Kahlon, K-A-H-L-O-N case, Judge Jones wrote a dissent. And she wrote this, and this gets to the point you were just talking about with Mr. Hilbert. Finally, I find it troubling that Kahlon and TJM never had a chance to present their case orally before the district court. Here in this case, what happened? The case was almost two and a half years old. It had been set for trial twice. It was bumping up against a trial setting. The district judge moved the hearing, moved the trial date, and then granted summary judgment. None of these summary judgments should have been granted in the first place, but there was never a hearing. I attended. After the summary judgment was granted, I got hired. I attended the only hearing that the court ever had. It was on damages, supposedly. No evidence was even put on. It lasted 30 or 40 minutes, and then out came the final judgment. We had moved for reconsideration and did everything in front of Judge Kincaid. He denied all that stuff, which he had the right to do, but we said he got it wrong. But there was never a deposition, never a trial, never a hearing with evidence, nothing. Out shoots a summary judgment. And what's that get to? That gets to the notion that it's a vanishing trial, which Judge Higginbotham always talks about and has been speaking about for years, that the trial judges are just wiping these cases off the court with either Iqbal or Twombly, 12B motions, summary judgment motions. This case screams out for a trial, which is there are a lot of facts here, and there are a lot of facts that relate to whether or not this joint venture, this partnership, was a security or not. My client was just a promoter, which gets to my second point, which is one of these things is not like the other. My client was a promoter. There is absolutely not a shred of evidence that my client had anything to do with running the joint venture. When you say promoter, what does that mean? Is he one of the ones that made the cold calls? He went out and made the cold calls. He was calling people. My client, though, the evidence is that's in the record is that my client properly vetted those people that he then turned over to the Parvizian group to see if they wanted to invest. That's what's in the record. The two affidavits that Mr. Hilbert mentioned, those two affidavits don't even mention my clients. Not a word. My clients don't even know them. And yet summary judgment is founded. But the question I have for you is how are we going to distinguish the difference between the promoter who, as the case law says, if you look at Nunez, the strong presumption, we've got to figure out the test, and this is from the Williams v. Tucker. It's in footnote 14. The test, rather, is what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect. In the enforcement of an act such as this, it is not inappropriate that the promoter's offerings be judged as what they were represented to be, which to me, which in that citing the SEC v. Howard case. How many promoters were there like your client? In this case that's been sued, AMG Energy and Gonzales-Chamay, and there was a guy named Balunus, and his company was called R. Thomas & Company. Roughly how many? Four. Four. But then my client had people that worked for him that called folks and stuff like that, but none of those folks got sued. You're representing only your client, not those other promoters. I do not represent them. They didn't get sued, and Balunus was represented by a different lawyer at the trial court level, and I don't know what happened on appeal. So what I'm saying is in order for the promoter, the guy like my client, he's got to be, you have to look at what he's promoting. It looks like a joint venture. He promotes it as a joint venture. He thinks it's a joint venture. That's the evidence. It's unfair to use post-invest, post-signing or post-promoting activity to say that it was a security he was selling. I don't want to use the word, well, it's not fair because that's not standard, but there has to be a standard for someone like my client that's different from what happened later on with the joint venture, the look back after seeing what transpired to say, oh, no, that's a security. It's not a joint venture, and that's the problem that we have, and that's why we think it should be reversed and the standard should be set for people like my client. Thank you. All right. Mr. Butter. Good morning. May it please the Court. Benjamin Butter for the Securities and Exchange Commission, and with me today is Jennifer Reese from our Fort Worth regional office. I would start by saying I wholeheartedly agree with Mr. Cox that investment schemes that are offered to the general public should be treated as what they are, as what they are offered to be, and the joint venture interests offered and sold by the defendants in this case are investment contracts under the analysis employed by the Supreme Court in the Joyner and the Howey cases. When looking at this, it's useful to think about these cases in three steps. First, how was the investment offered? Second, who was it offered to? And third, what were the economic realities of the investments being offered? And here, when you look at what happened, they were offering investment contracts. There is no dispute here at all that these investment schemes were offered in a nationwide cold calling campaign, and they used lead lists. I believe Mr. Gonzalez used lead lists he got from Mr. Parvizian. Mr. Balunas used lead lists I think that he had developed on his own, according to the record. And before Mr. Gonzalez and Mr. Balunas had their own companies, Mr. Gonzalez in particular worked for Amarest, which was Mr. Parvizian's company, which got shut down for failure to cooperate with an investigation by the Texas securities regulator. So this is a nationwide long-term cold calling campaign. They also don't dispute that they ended up with 380— Does cold calling mean someone automatically violates the second prong of Williamson? Well, Your Honor, I think the cold calling has some relevance to both the first and second prongs of Williamson. When you look at Williamson itself, in the discussion of the first prong, the Court points out that if you end up with a sales regime in which you are trying to sell what are purported partnership interests to a broad cross-section of the general public nationwide, and then you end up with purchasers nationwide, what you have is you have an investment structure that more resembles that of a limited partnership or a shareholder. Because the votes of this dispersed partnership really don't add up to the same thing as sort of a tight-knit five-, six-person general partnership like you had at issue in the Nunez case. And it's also relevant I think to the second Williamson factor, because that focuses on the capability or the ability of the investors themselves to effectively manage. And if you have, you know, inexperienced members of the general public who aren't themselves skilled in the business of oil and gas or in the business of oil and gas drilling, they are unlikely to be able to effectively manage their investment. So it's both a problem of dilution of the power of voting under the first prong, which leaves you with an investment where they have no effective power under the structure of it, and with the second prong, the inability to effectively manage. But even if cold calling is the method used, I mean there may be a presumption that cold calling means you don't really care about the sophistication of those who invest. But so if a campaign uses cold calling as their vehicle, as their tool, and that can be rebutted by evidence that those who actually signed up were experienced investors, right? It's not an irrebuttable presumption that cold calling leads to inexperienced people investing. Well, I suppose that looking at the actual investors themselves, if you wanted to look at each individual investors, could be some relevant information. However, we need to recall that this is an offering fraud. Well, fraud isn't necessarily, this is an offering violation. So it's an unlawful offering of securities. Whether an offering exists doesn't necessarily hinge on who ultimately purchased the offering. So we do have a Section 5 finding here, and that is a strict liability offense. So I would like to address a couple things that came up earlier. I know Chief Justice Stewart had several questions about the record. There is, in fact, evidence in the record on every single one of the joint ventures at issues in this case. On page 6 of our brief, there's a footnote, footnote 3. Evidence in what format? Well, we have all of the offering documents from each of those joint ventures, and we have cited that in footnote 3 on page 6 of our brief so you can see the exact place in the record. And there were cross motions for summary judgment, Your Honor. There are, and I believe I'm correct about this, 17 investor declarations. It would go to the heart of my initial question, and that is I didn't do a full search, but we did try to look at a number of these actions that have come up in the district courts, et cetera. Just unscientifically, look at a whole lot of them were said differently. A few of them were summary judgment determinations. They were some kind of trial, some parsing of evidence, et cetera. So, it just, you may be right, but it just seemed oddly postured. You're relying on declarations. You're relying on affidavits. You're relying on the papers, not we depose Gonzalez and this person, and based on what they said, King's X. You know, we're entitled as a matter of law. You say, I mean, to me, a threshold, is this a security? You said it's the offering. You know, they say something else. Within the case, there's, well, you know, where there was no communication between the investors. Then there's somebody else who says, yes, there was. There's e-mails and so forth. So, it's just, I have a hard time getting a Rule 56 head around, notwithstanding the force with which you make the points, but just the sheer fact that there are 300 and something or whatever it is, investors out there and all of that, of how even a summary judgment after some adducing of evidence or deposition, that might be one thing, but it just seems odd. So, is it the course? You're the SEC and you do this. Is this generally, you tied up on the, is this offering security, et cetera, and that's how the summary judgment is posited for the district court to make? Because nobody's disagreeing about Williamson being the case law. Nobody's disputing what's applicable here, but how the features of this case fit that. Well, Your Honor, there's actually, I think, more to the record than might first appear, because the Commission's enforcement actions aren't, you know, your usual civil litigation. We actually do extensive investigations before we file actions. So, in this record, there are transcripts of investigation testimony, and this is sworn testimony, Your Honor. It's effectively the same function as a deposition from Mr. Balunis, from Mr. Gonzales, from Mr. Parvizian. I believe from at least two Arcturus employees or two employees of Mr. Parvizian as well. And we've cited that extensively in our brief. In fact, the information or most of the data or the facts about the offering itself, facts which are undisputed so far as I can tell, come from that investigation testimony. That's how we know they did the cold calling. That's how we know the structures of the various companies and their relationship to Mr. Parvizian. So there is, in fact, extensive testimonial evidence in this record. In addition to that, there are all the offering documents, which are the offering itself. There's copies of the confidential information memorandum and the joint venture case. You know, issues like who had control and how was there control and communications, et cetera. I mean, how does one get that just from the declarations? Well, the question of control over the investment. Well, I just use that just as one example in going through the Williamson factors and trying to read. I'm not being argumentative with you. I'm just trying to understand. It just seems the SEC makes strong arguments on these points, but then the counterpoint, okay, the SEC says there's no communication. And then there's some, well, here's some e-mails of some investors that did communicate. So I'm just trying to get my head around not that your point doesn't have validity, but just in the context of Rule 56 that you're entitled to judgment as a matter of law, construing the evidence in a way most favorable to the non-moving. And just I hear you, and maybe you're right. This is something different.  And so I guess another way of saying, you're saying here there's absolutely no necessity for the district court or a trier fact to make any credibility determinations in order to articulate that all the standards under Williamson and the applicable case amendment, is that what you're saying? Well, I guess I'd like to answer that in probably at least two parts. First, I think it's important to recall that the Williamson factors, if any one of the three are satisfied, it's not necessary for the commission to establish all three. And second, I think this record is sufficient because it does in fact include all of the relevant offering documents, which are probably the most relevant thing for the purposes of the first Williamson factor. You look at the structure of the actual investment itself that was offered and sold to the general public. And second, it is in fact sworn testimony. This was investigative testimony, so it's the equivalent of a deposition at the end of the day. So we have heard on the record from Mr. Parvizian, Mr. Balunas, and Mr. Gonzalez. And in addition, there are these investor declarations that are also in the record. I would be remiss if I didn't point out that these 15 declarations that are cited extensively in the defendant's briefs were not in fact cited quite so extensively to the district court. They in fact cited these precisely twice, and they cited only the cover page of the exhibit itself. So that really didn't give the district court much to grab onto and understand what they thought these declarations established. So that, I think, is another issue with their reliance on them on appeal. Now, I guess to the larger question of your Honor seems to be asking about credibility assessments here. And the issues that they've raised related to credibility in this appeal aren't terribly material to the question of whether they sold investment contracts. So they're challenging sort of the credibility of Mr. Ulrey in his declaration, because Mr. Ulrey says, well, I didn't actually know how to contact my fellow investors. Well, what Mr. Ulrey says is that Mr. Parvizian did not give him the information when he asked for it. Now, that really isn't in dispute. Yes, Mr. Ulrey did get contact information for, I believe, the Hillock Joint Ventures, his fellow investors there, but he got it by accident. And that is not disputed at all, that he ended up with that by mere accident because one of Mr. Parvizian's employees mistakenly sent an e-mail that revealed e-mail addresses. None of that is disputed. And he also raises some credibility issues, I believe, related to the Travers declaration, because Mr. Travers said in his declaration that he didn't vote or he didn't recall voting. And there's evidence in the record that Mr. Travers, in fact, returned ballots. But the Commission isn't disputing that these investors did, in fact, vote on certain things. Our position is those votes weren't even that meaningful at the end of the day when you look at the economic realities of the investment. And the reason they weren't meaningful was by the time they were actually voting on anything, which was usually a vote whether to proceed to completion or not, the voting itself was sort of a sham in one way because if they didn't vote in favor of completion and send in the money, they lost their entire interest in the well. They forfeited everything they'd invested, and they lost any hope of return in the future. So kind of a Hobson's choice, as we explained in our brief. And then on top of that, that vote was taken on the basis of information that they received filtered through Mr. Parvizian. We don't dispute, by the way, that Mr. Parvizian hired third-party experts. We don't dispute that Mr. Parvizian had a subcontract with a well driller and that Mr. Parvizian and his companies did not themselves drill the wells. But we would point out that Mr. Parvizian selected that subcontractor. He selected those experts, and he provided recommendations. This is somewhat similar to the long case where the promoter or the manager really does control the flow of information. We aren't saying that the information was false. We're just saying that he did actually have control over the flow of information, and we've in fact cited this information in our brief. And if you look at it, it's highly technical. Understanding a well log is not something that someone without some technical expertise can do as a typical matter. I mean, I looked at the well logs myself, and I confess I wouldn't be able to decide whether to vote for completion or not. So I think that approaches an answer to your question, Chief Judge, I hope. Thank you. No, I appreciate it. And I would just like to reiterate that we do – we believe that we win this case in that the district court properly entered summary judgment under both the broader inquiry stated in Joiner and Howey and under the very specific application of Howey's third prong in the Williamson factors. And I believe we have explained that in their brief, but I would like to answer any questions the court has because there have been a number of questions. Well, if the court has no further questions, we will rest on our brief, and we would ask that you affirm the judgment of the district court. All right. Thank you, sir. All right. Back to you, Mr. Hilbert. Thank you, Your Honor and members of the panel. There is a complete dearth of record before this court. The statements that the SEC obtained are still not subject to cross-examination, which Your Honor has keenly addressed. But this is a finding of fraud. Well, he says all the declarations are the equivalent of sworn testimony and to the extent that they aren't subject to cross, you know, the SEC takes them as they are and nonetheless is. But they're not subject to cross-examination. I mean, we weren't there. And as you know, that's where the truth comes in many, many times. But I think one of the key things here, this is a partnership. These partners could vote to change Schlumberger or Halliburton or Baker Hughes by a simple majority vote, and they're able to take this phone book of information that they received with the SIM. Given the SEC's argument, tick off for me 1, 2, 3, 4, 5, 6, 7, 8. What are the disputed issues of fact that if this were a SIM pact would be tried? The SEC has ably responded to the questions about why not. So just, you know, real quickly. He says you've got Mr. Peruvian's statement. He says he's got his. So just tick off for me. What are the disputed? Many, he says, yes, they're fact, but they aren't material. So tick off for me real quickly. What are the crucial disputed facts that rebut the government? I mean, the SEC's. Well, that these investors were not qualified investors. All of their affidavits indicate that they're tremendously well-qualified, sophisticated, accredited investors all the way, very educated, run their own businesses, capable of making business decisions, and did. They all voted. The two affidavits that they have that say that they didn't vote, they did. I've got their ballots. They're in the record. And one said that the vote's illusory, and then he specifically handwrites how he wants his vote applied in a particular circumstance to play both ways. It's in the record. These guys did and were very active. That there were no contact among partners is a complete ruse. Mr. O'Reilly himself ran a blog, and he and all of the investors communicated very, very frequently about all kinds of things related to the partnerships. The screening questionnaires that asked about education, investing history, experience, what was done with those? If a potential investor – would you all turn away? Yes. Folks who – Yes. So after we get that form, Mr. Parvizian and the members of his group would then vet those candidates. You put a good point on cold calling. It is a ruse. Cold calling is this bad buzz phrase. But those are cold calls from a lead list of qualified investors, and then we further qualify them by their affidavits, and we further qualify them by conversations with them to ascertain whether they have adequate experience to make good business decisions with respect to an oil and gas partnership. And if they said no, what does that mean for their application? They're out. They're not admitted. So all of these are very carefully vetted, and they're only allowed in if they're qualified and can make legitimate business decisions with respect to, specifically with respect to, oil and gas partnerships. And to find fraud on this record is ridiculous. And the last thing, Your Honor, back to your summary judgment point. The summary judgment should be granted in our favor because of the strong presumption, extremely difficult factual burden, and the heavy burden of proof that Williamson and Nunez say is the SEC's burden that they haven't overcome by two affidavits. He says, Mr. Vedder says, the joint ventures here are investment contracts as a matter of law. He says they're securities. He says that's not a factual issue in dispute, but as a matter of law, that's the way, you know, they've come out to bat. So are there facts related to that? Are the offerings themselves, as he has articulated, a matter of which the court could have and did make that determination? The court put those glasses on, but he's absolutely wrong as a matter of law. And we've cited the cases to you, but these are partnerships. They are not investment contracts. Mr. Vedder says the SEC isn't disputing whether the investors voted or not. So he says that's not a dispute of fact, but he says the voting process was a sham. Is that a dispute? Absolutely not. And let me give you an example. Completion of a well is the most important aspect of any project. So while Mr. Provisian may have selected a location and may have selected an operator and may have gotten the thing underway, and then you drill, and then from all the studies you obtain from these super experts, you make a determination, and each of the partners votes to complete the well. And they vote and they pay more to complete the well. So they're making a decision not only on paper but with their wallet to complete the well. And they can take this information that they have to any expert they want to verify that they should or should not complete the well. There's absolutely no fire under their feet. The SEC frames this as a legal determination, not one that is credited with facts. And I don't want to misstate what you said, but he says to the extent that there are factual differences, they are not material to the question. Is that what he's saying? And so he says the investment offerings are the key documents that are in the record and which are sort of the turning point here on why the SEC was entitled to judgment as a matter of law, not these other factors, because he says all they have to do is win on one factor. Did I state that generally the way you put it, Mr. Vetter? Yes, sir. Close enough for government work? All right. I'm just seeing your own rebuttal, so that's why I'm trying to get your rebuttal to at least the way I tried to, in general, not put words in his mouth. But I'm just trying to cut through this fact versus no fact. They say they're entitled as a matter of law because the key documents are the investment offerings, which are in the record, and those themselves give them entitlement to judgment as a matter of law. The key case is the Kenlog case. It's still the law. It's in our brief, and it says that this is a partnership and not a security. Now, the very, very important fact of this matter is that the biggest firm in the world, Baker & McKenzie, and the biggest specialist in the world on securities, not securities, Joel Held, drafted these SINs. They're used all over the country. They're refined all over the country to make sure that they're not securities. So on paper, you can't get to the conclusion that the SEC would love to get to, and so the judge is just wrong to rule as a matter of law, but he didn't. He ruled on summary judgment on a dearth of record without substantial facts when we have a myriad of material facts for the court to decide. All right. Fair enough. Just wanted to give both sides a chance to air out and answer the questions. Thank you both sides. Thank you both very much. Both sides to present on it. I mean, it's an interesting case. We'll go through the record, and we'll get it decided. Just as an aside, we're often asked about appellate deals, and I noted your associate bringing you that big old chart up there to put by the table, which was never used, and I'm not suggesting you use it now, but we often tell lawyers, appellate lawyers have a terrible time figuring out how to use or not this wonderful stuff they developed below. It's just hard to make it work in an appellate argument. So she brought it up there, but it shall remain as is. It's just an observation. I'm sure it's pretty on the other side, but we don't get to see it. All right. Thank you, counsel, for both sides. I appreciate your argument. The case will be submitted, and we'll get it decided. All right. Let's take one more, and then we may take a short break after the third one. You all good with that? You want to take another one? Okay. All right. Janvey v. GMAG. Oh, I'm sorry, Mr. Gibbons. No, no, no. I'm pardoned. I got up. Hold on. Don't go anywhere. I jumped the gun. I didn't know to say anything, but I had two minutes. Mr. Cobb. No, I don't want to cut you off. I didn't mean to. Go ahead. I'm going to give you the chief judge's error, of which I profusely apologize. That's all right. That's all right. I just want to briefly address just one point that the SEC says, and we rely on everything else in our brief. And the thing there that we didn't get to talk about, and nobody wanted to mention it, is this notion of disgorgement, and where it comes from and how it's created, and is there a statutory way to it, and there's not. We'd ask this court, that was my goal boldly where no one has gone, which is declare that disgorgement is not an available remedy. For my clients here, it's a double, and for everybody, it's a double punishment. We know disgorgement is a penalty. So my client got penalized, disgorgement of $100,000, and then penalized again under a tier one penalty. So he's getting penalized twice here on no evidence whatsoever. None. As according to my client, we didn't run the joint venture, and we know that. But there's no evidence here. As you note, there's no record of was the money stolen? Did the money go away? Who took it? Whose pocket is it in? Where did it go? Why isn't there a receiver? None of that's here. There's no evidence that the money was stolen by anybody. None. And so we, my client, is just the promoter. And at the time we're promoting it, it looks like a joint venture. He thinks it's a joint venture. He promotes it as a joint venture. It's that old thing, if it looks like a duck, quacks like a duck, and walks like a duck, it's a duck. My client thinks it's a joint venture while he's doing it, and he shouldn't be stuck with what happens. And the SEC even writes that they're not in their brief, that they're not putting post activity onto my client. So that's what I wanted to say, and thank you. I apologize. Thank you, and again, I apologize. That's all right. No worries. Thanks a lot. It was that chart that distracted me. All right. Now we'll call up the third case, Janby v. GMAG.